

U.S. Department of Justice

United States Attorney
Eastern District of New York

NA:KMT/KM                         271 Cadman Plaza East
F.# 2010R02346                    Brooklyn, New York  11201

February 11, 2014

The Honorable Steven M. Gold
Chief Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

            Re:     United States v. Lupoi, et al.
                    Criminal Docket No. 14-0042 (SJ)

Dear Judge Gold:

            The government respectfully submits this letter to request permanent orders of detention with respect to the defendants Franco Lupoi, Raffaele Valente, Alexander Chan and Jose Alfredo Garcia, also known as "Freddy."  The government seeks substantial bail packages for defendants Charles Centaro, also known as "Charlie Pepsi," Christos Fasarakis and Dominic Ali.

            As further described below, because of the nature of the charges against the defendants, the strength of the government's case, the significant jail time the defendants face and their ties to various violent criminal syndicates, Lupoi, Valente, Chan and Garcia pose both a danger to the community and a risk of flight that cannot be mitigated by any condition or combination of conditions.  In addition, under 18 U.S.C. § 3142(e)(3)(A) there is a presumption that Lupoi, Chan and Garcia should be detained, and for the reasons set forth below, they cannot overcome that presumption.  Centaro, Fasarakis and Ali should be required to present a substantial bail package to mitigate the risk of these defendants' flight from prosecution.

I.      Background

        A.      Investigation

            The superseding indictment returned in this matter is the result of a long-term undercover investigation by this Office and the Federal Bureau of

Investigation ("FBI"), which collaborated with Italian law enforcement authorities in an ongoing investigation of the criminal activities of the defendants and their criminal counterparts.  This investigation, which utilized undercover agents, consensual recordings, court-authorized wiretaps abroad, email search warrants and surveillance, among other tools, yielded voluminous evidence, including more than two years of consensually recorded telephone calls and meetings involving all seven defendants.

The investigation resulted in seven arrests in New York.  In addition, 17 arrests were made today in Italy as a result of the Italian investigation, including Lupoi's father in law, Antonio Simonetta, and his cousin, Francesco Ursino.  Italian authorities have also brought charges against U.S. defendants Lupoi, Chan, Garcia and Valente.

The investigation revealed Lupoi's close criminal ties to both the Gambino organized crime family and the 'Ndrangheta, an Italian criminal organization akin to the Mafia in Sicily and the Camorra in Naples.  Lupoi used these organizations to pursue criminal activity that stretched across the globe.

Here in New York, Lupoi is associated with Pietro "Tall Pete" Inzerillo, a soldier in the Gambino crime family, and Frank Cali, the underboss of the Gambino crime family.  Records show that Lupoi travelled internationally with Cali in 2005.  The Gambino family's violent history in the Eastern District of New York and elsewhere is well-known and well-documented.  See generally United States v. Matera, 489 F.3d 115, 119–20 (2d Cir. 2007).

In Italy, Lupoi is connected to the violent and dangerous 'Ndrangheta criminal organization through his father-in-law, Italian defendant Nicola Antonio Simonetta, and his cousin, Italian defendant Francesco Ursino.  Both are members of the 'Ndrangheta and Ursino is believed to the street boss of the Ursino clan.

In 2012, Simonetta traveled to Brooklyn and met with Lupoi and an undercover FBI agent, who recorded Simonetta and Lupoi discussing plans to ship narcotics between the U.S. and Italy via the port of Gioia Tauro in Calabria, an infamous hub of 'Ndrangheta activity.  Simonetta revealed that his 'Ndrangheta associates at the port would guarantee the safe arrival of container ships containing contraband.

Lupoi exploited these underworld connections to link his criminal associates in New York with those in Calabria, forming conspiracies to traffic heroin and cocaine.  On the Italian side, he engaged Ursino and others as suppliers of heroin and buyers of cocaine.  During two coordinated FBI-INP operations in Italy, Lupoi and Ursino sold over 1.3 kilograms of heroin to an FBI undercover agent for what they believed was eventual distribution in the United States.  In New York, Lupoi, Chan and Garcia sold the undercover agent more than a kilogram of heroin.

2

Valente, a defendant in the U.S. and Italy, is also a member of the 'Ndrangheta and, as described below, was working to establish an armed crew of 'Ndrangheta associates in New York.

A.     Superseding Indictment

On February 6, 2014, the grand jury returned a sealed superseding indictment (S-1) charging the following defendants with the following crimes:

| Count | Defendant(s) | Charge |
|-------|--------------|--------|
| One | Lupoi | Money laundering in violation of 18 U.S.C. § 1956(a)(3) |
| Two | Lupoi, Ali, Fasarakis | Money laundering conspiracy in violation of 18 U.S.C. §§ 1956(a)(3), 1956(h) |
| Three | Lupoi, Ali, Fasarakis | Money laundering in violation of 18 U.S.C. § 1956(a)(3) |
| Four | Lupoi, Centaro | Money laundering conspiracy in violation of 18 U.S.C. §§ 1956(a)(3), 1956(h) |
| Five | Lupoi, Centaro | Money laundering in violation of 18 U.S.C. § 1956(a)(3) |
| Six | Lupoi | Marijuana distribution in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(D) |
| Seven | Lupoi | International heroin distribution, in violation of 21 U.S.C. §§ 959(a), 960(a)(3) |
| Eight | Lupoi | International heroin distribution conspiracy, in violation of 21 U.S.C. §§ 959(a), 959(c), 960(a)(3), 960(b)(1)(A) |
| Nine | Lupoi, Chan, Garcia | Conspiracy to distribute heroin, in violation of 21 U.S.C. §§ 841(b)(1)(A)(i), 846 |

3

| Ten | Lupoi, Chan, Garcia | Possession of heroin with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(i) |
| Eleven | Lupoi, Chan, Garcia | Conspiracy to commit money laundering to promote cocaine trafficking, in violation of 18 U.S.C. §§ 1956(a)(2)(A), (h) |
| Twelve | Lupoi, Chan, Garcia | Money laundering to promote cocaine trafficking, in violation of 18 U.S.C. § 1956(a)(2)(A) |
| Thirteen | Valente | Possession of unregistered silencer, in violation of 26 U.S.C. §§ 5845(a), 5861(d) |
| Fourteen | Valente | Possession of silencer without a serial number, in violation of 26 U.S.C. §§ 5845(a), 5861(i) |
| Fifteen | Lupoi, Valente | Conspiracy to transfer a 9mm firearm and silencer, in violation of 26 U.S.C. § 5961(e) |

C.     Charged Crimes

The government proffers the following facts concerning the charges at issue and pretrial detention.[1]  See United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (explaining that the government is entitled to proceed by proffer in a detention hearing); United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986) (same).

1.     International Heroin Distribution

From the outset of the investigation, Lupoi discussed his contacts in Italy during consensually recorded phone calls and consensually recorded meetings with the undercover agent.  In April 2012, Lupoi told the undercover agent that his father-in-law, Simonetta, had contacts at a port in Calabria, and that Simonetta could

---

[1] The proffer of facts set forth herein does not purport to provide a complete statement of all facts and evidence of which the government is aware or that it will seek to introduce at trial.

4

guarantee the passage of contraband in and out of the port.  On April 20, 2012, at a meeting in Brooklyn, Lupoi discussed the use of the port to import and export contraband from Italy, and he introduced the undercover to Simonetta, who was visiting the United States.  Before Lupoi introduced Simonetta to the undercover agent, Lupoi explained, and FBI agents subsequently confirmed, that Simonetta was convicted of trafficking and conspiracy to traffic in narcotics in 1981 in Canada and sentenced to 14 years' and 10 years' imprisonment, respectively.

Before the meeting with Simonetta, Lupoi explained his father-in-law's contacts to the undercover agent:[2]

Lupoi:        Personally him, he's got a good hook with the, uh, a good, uh, person at the port.

Undercover:  Perfect ok.

Lupoi:        It's Gioia Tauro. It's one of the largest ports in Europe right now.  It's in Calabria. And they do . . . it's a finanziere [a member of the Italian Guardia de Finanza]. It's a . . . a . . . what are there here? Not the IRS? Who are the people who inspect all the. . . .

Undercover:  Like customs or . . . ?

Lupoi:        Customs. [Lupoi answers cell phone and has conversation]

Lupoi:        This is the way I brought it up to him. We, we, . . . I have a good friend of mines who wanna get more contacts in Europe.  Now, uh, of course, contacts – not a candy store or pizzeria, he owns a restaurant there.  I made him understand what contacts.  And he said that he's got very very good hook, himself – of course he's not alone, he's got people . . .

Undercover:  Right, right, right, absolutely.

Lupoi:        And it's uh, what you said?

Undercover:  Like a customs guy?

_____

[2] All quoted language in this filing is based on draft translations and transcripts, which are subject to change.

5

Lupoi:          One of the heads customs.

Undercover:  Nice.

Lupoi:          Let's say, maybe he can guarantee 10 containers or he
                can guarantee seven.  And he mentioned, he told me
                straight out – "coke."

*          *          *

Undercover:  What about bringing stuff here?

Lupoi:          I told him, I made him understand arms, that's what
                you…I said sometimes heroin.

Undercover:  Yeah, heroin and guns.

The undercover agent then met with Simonetta and Lupoi.  Simonetta stated in part: "I know people over there – ok, friends of mine.  I can ask him to – what he can do with this.  But this is nothing to talk on the phone.  I'll be leaving in a week or so.  I can talk to these people and ask – how are you going to do it?"  Lupoi then asked Simonetta in Italian about how many "containers" could be guaranteed.  Simonetta responded in Italian "and how many do they have" and then, before Lupoi could answer, Simonetta commented in English "I gotta talk to him to see."  Lupoi and the undercover agent then got back in the car and Lupoi explained that Simonetta did not say it "straight out" because "he's always playing the safe side" because Simonetta "did twenty-five years in jail," "eleven years in Italy, ten in Canada."[3]

During the meeting, Lupoi suggested to the undercover that they would travel to Italy for further discussions about the port.  During these discussions in the course of consensually recorded phone calls and meetings, Lupoi also discussed the purchase of heroin in Italy for importation and sale in the United States.

The undercover agent travelled to Italy in July 2012, ostensibly to meet with Lupoi's contact at the port.  The meeting with Lupoi's port contacts did not happen, because, Lupoi advised, the port contact was being cautious and did not want

---

[3] The Royal Canadian Mounted Police have confirmed that Simonetta was convicted of trafficking and conspiracy to traffic in narcotics in 1981 and was sentenced to 14 years and 10 years' incarceration, respectively, to be served concurrently.  He was paroled and deported to Italy in 1985.  The Italian National Police has confirmed that Simonetta was arrested in Reggio Calabria in 2002 for conspiracy to traffic in narcotics.  In 2007, the Court of Appeals of Reggio Calabria ordered that Simonetta remain in the country pending the outcome of his case.

to meet. While the undercover agent was in Italy, however, Lupoi arranged to sell the undercover agent heroin for distribution in the United States. On July 26, 2012, during a consensually recorded meeting at the Reggio Calabria airport in Italy, Lupoi delivered a sample of heroin to the undercover agent. The undercover agent then returned to the United States and Lupoi remained in Italy. In July and August 2012, in the course of consensually recorded phone calls with the undercover agent, Lupoi continued to discuss the purchase of heroin and the shipment of narcotics through the port in Gioia Tauro, during which time Lupoi told the undercover his port contact could guarantee safe passage of unlimited shipping containers for €200,000.

On August 20, 2012, the undercover agent travelled to Italy to purchase heroin from Lupoi. On August 27, 2012, Lupoi delivered approximately 1.5 kilograms of heroin to the undercover agent in exchange for €30,000. Lupoi believed the heroin would be smuggled back to the United States for resale. In the course of a subsequent consensually recorded conversation, the undercover learned that the heroin had come from Francesco Ursino, Lupoi's cousin, who was arrested today in Italy on charges that include the sale of heroin.

2.  Guyana-Italy Cocaine Conspiracy

On September 12, 2012, Lupoi explained to the undercover agent that he had contacts in Guyana who could arrange the shipment of cocaine to his contacts in Italy. At the meeting, which was consensually recorded, Lupoi told the undercover agent, that he had "a great connect," who could "pack it [cocaine] into the fish," and then "freeze it in a block." Lupoi told the undercover agent that the supplier was a "Mexican with the cartels," who would ship it from Guyana to Italy, and possibly on to Canada where Lupoi had "buyers to buy it up in Canada."

Lupoi later explained to the undercover agent that there were also others involved in the scheme. On October 8, 2012, the undercover and Lupoi met to further plan for the cocaine shipment. During the consensually recorded meeting, Lupoi explained that "they put a hundred grams, two hundred grams in each fish" and "it takes a day to defrost and then it takes a day to take out." With regard to receiving his cut of the money from the cocaine deal, Lupoi explained that he had "no worries" because "we're dealing with the Italian mob."

On October 10, 2012, Lupoi told the undercover agent that the source of the cocaine "is a close connect with the Chinese [guy]. The Chinese [guy] brought it up to this Greek [guy], and the Greek [guy] brought it up to me and that's how I connected." Lupoi went on to explain that "if something goes bad, they're going to aim me, they're gonna aim the guy that's here, and they're gonna aim the Greek. The Greek guy's gonna go the first, because he's the one who put the connection with me."

7

On December 1, 2012 at a Dunkin Donuts located in Manhattan, the undercover met with Lupoi and the other members of the conspiracy, including the "Mexican with the cartels" – Jose Alfredo Garcia – and the "Chinese guy" – Alexander Chan.

Lupoi, Chan, Garcia and others made extensive plans for the cocaine shipment in emails, recorded meetings, and recorded telephone calls.  In preparation for the shipment, coconspirators in Italy took control of a fish wholesaler to act as a front company for receipt of the cocaine.  They subsequently discussed having the cocaine packed in pineapple and charcoal for shipment to Italy.   Up until the time of their arrest yesterday, Lupoi, Chan and Garcia continued to work on the plot to ship cocaine from Guyana to Italy.

3.   Heroin Distribution in the United States

While Lupoi, Chan, Garcia and others were planning the Guyana-Italy cocaine shipment, Lupoi negotiated a heroin deal with Chan and Garcia for local distribution.  On March 20, 2013, during a consensually recorded meeting, Lupoi met the undercover agent in Brooklyn and provided a sample of heroin.  During the meeting, the undercover agent spoke to Chan on Lupoi's cell phone, and during the conversation Chan told the undercover agent that the sample of heroin had come from him.

On April 10, 2013, at a consensually recorded meeting in Manhattan, Chan sold Lupoi and the undercover agent 1.3 kilograms of heroin.  The undercover agent had been prepared to purchase 250 grams of heroin from Chan, but Lupoi insisted that they purchase more.  The undercover agent refused and explained that he did not want to purchase more than the agreed-upon 250 grams of heroin.  Lupoi then negotiated with Chan to purchase a larger amount of heroin with a down payment on that date and the remainder on credit.  Chan and Garcia then provided the undercover with 1.3 kilograms of heroin and a down payment and the remaining balance on credit.

4.     Illegal Transfer of a 9mm Pistol and Silencer

On May 4, 2013, during a consensually recorded meeting, Valente bragged to the undercover agent about some of the firearms he owned, including a handgun and silencer.  On January 23, 2014, the undercover called Lupoi to ask if Valente would be willing to sell the silencer.  Lupoi agreed that he would, and also agreed to contact Valente to arrange the deal.  On January 31, 2014, the undercover travelled to Lupoi's bakery, Royal Crown Bakery in Brooklyn, to receive the handgun and silencer.  During a consensually recorded meeting, Valente gave the handgun and silencer to the undercover agent and showed the undercover agent how to attach the silencer to the handgun.  The silencer has no serial number.

5.     Marijuana Trafficking

Beginning in or about February 2012, Lupoi told the undercover agent about his marijuana connections in Canada.  During a consensually recorded conversation, Lupoi told the undercover agent that he could import up to 300 pounds of marijuana per month, on credit, through his cousin in Canada.

On March 30, 2012, Lupoi delivered five pounds of marijuana to the undercover agent for $3,400 per pound.  On May 22, 2012, Lupoi delivered one pound of marijuana to the undercover agent for $3,800.  Lupoi provided another sample of marijuana to the undercover agent on January 9, 2013 for $1,000.  All three of these meetings were consensually recorded by the undercover agent.  In addition to the consensually recorded meetings, the undercover agent made numerous consensual recordings of phone calls and meetings with Lupoi during which Lupoi discussed the purchase and distribution of significant quantities of marijuana.

II.     Legal Standard – The Bail Reform Act

Under the Bail Reform Act, 18 U.S.C. § 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. 18 U.S.C. § 3142(e) ("no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community").  A finding of dangerousness must be supported by clear and convincing evidence.  United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985).  A finding of risk of flight must be supported by a preponderance of the evidence.  United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); Chimurenga, 760 F.2d at 405.

The Bail Reform Act lists the following four factors as relevant to the determination of whether detention is appropriate: (1) the nature and circumstances of the crimes charged, (2) the history and characteristics of the defendant, (3) the

seriousness of the danger posed by the defendant's release, and (4) the evidence of the defendant's guilt.  See 18 U.S.C. § 3142(g).

The Second Circuit has repeatedly stated that even elaborate conditions of home detention cannot substitute for incarceration where the defendant is violent or cannot be trusted to comply with the conditions of release. See United States v. Millan, 4 F.3d 1038, 1048-49 (2d Cir. 1993) (home detention and electronic surveillance can be circumvented); United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993) ("home detention and electronic monitoring at best 'elaborately replicate a detention facility without the confidence of security such a facility instills'") (quoting United States v. Gotti, 776 F. Supp. 666, 672 (E.D.N.Y. 1991)); see also United States v. Tortora, 922 F.2d 880, 886-87 (1st Cir. 1990) (elaborate conditions dependent upon good faith compliance were insufficient where the defendant's violent history provided no basis for believing that good faith would be forthcoming).

III.    Lupoi, Valente, Chan and Garcia Should Be Detained

For the reasons set forth below, the defendants Franco Lupoi, Raffaele Valente, Alexander Chan and Jose Alfredo Garcia each pose a substantial danger to the community and a flight risk.  For each of these defendants, all of the relevant considerations under the Bail Reform Act strongly favor a permanent order of detention.

A.    Franco Lupoi

Franco Lupoi poses a substantial flight risk because (1) he faces a maximum term of life imprisonment and a minimum term of ten-years' imprisonment if convicted of Counts Seven, Eight, Nine or Ten, see 18 U.S.C. § 3142(e)(3)(A); (2) he has ties to Canada, Poland and Italy; (3) he has criminal connections able to smuggle people across the U.S.-Canada border without detection; and (4) his coconspirators and others with ties to violent and retributive organized crime groups may blame Lupoi for introducing the undercover agent into their schemes.  In addition, Lupoi poses a danger to the community because of (1) his participation in a conspiracy to transfer a 9mm pistol and silencer with no serial number and sawed-off shotgun; (2) his attempt to purchase hundreds of pistols and machine guns to ship to Italy; and (3) his ties to organized crime.

1.    The Nature and Circumstances of the Crimes Charged

As set forth above, Lupoi is charged in 13 of the 15 counts in the superseding indictment.  He is charged with distribution of heroin in the U.S., the distribution of heroin in Italy, a conspiracy that involved the shipment of hundreds of kilograms of cocaine from Guyana to Italy, a conspiracy to transfer a 9mm pistol and silencer and, together with his codefendants Centaro, Ali and Fasarakis, with laundering more than $500,000 in what the defendants believed was proceeds of

narcotics and illegal weapons distribution.  For these crimes, Lupoi faces a maximum sentence of life imprisonment.  For counts Seven, Eight, Nine and Ten, he faces a mandatory minimum of 10 years' imprisonment.

Under the Bail Reform Act, it "shall be presumed that no condition or combination of conditions will reasonably assure the appearance of [Lupoi] as required and the safety of the community" because Lupoi faces a maximum term of life imprisonment if convicted of Counts Seven, Eight, Nine or Ten.  See 18 U.S.C. § 3142(e)(3)(A);  Counts Seven and Eight charge violations of the Controlled Substances Import and Export Act, see 21 U.S.C. § 951, et seq., and involve more than one kilogram of heroin.  Counts Nine and Ten charge violations of the Controlled Substances Act, see 21 U.S.C. § 801, et seq., and involve more than one kilogram of heroin.  All four counts provide for a maximum term of life imprisonment and a minimum term of ten years' imprisonment, and, accordingly, the rebuttable presumption of detention under 18 U.S.C. § 3142(e)(3)(A) applies.  Lupoi cannot overcome this presumption and he should be detained.

Finally, the nature of the charged crimes – including domestic and international drug trafficking, the transfer of firearms – are serious.  Together they demonstrate that Lupoi is a sophisticated criminal capable of using complex means to commit serious crimes.  Accordingly, this factor favors detention.

> 2.     The History and Characteristics of the Defendant

> (a)     Lupoi's Ties to Canada and Italy

Lupoi has extensive ties to Canada and Italy.  With respect to Canada, as described above, Lupoi sold more than six pounds of marijuana purchased from his cousin in Canada to the undercover agent in New York.  This amount of marijuana understates Lupoi's connection with his Canadian suppliers, however.  On February 15, 2012, Lupoi told the undercover agent he could import up to 300 pounds of marijuana per month from Canada.  On February 23, 2012, Lupoi told the undercover agent that he could purchase large quantities of marijuana from his cousin in Canada, and he had done so in the past.

| | |
|---|---|
| Undercover: | And you've done this before?  You know what you're doing with this stuff?  [UI] These are people you know and trust? |
| Franco: | Yes, of course. One is a cousin…I mean, he's a family member.  But the thing is I don't know the people like a guy like you, the people who are gonna buy it, then I'm gonna trust you.  If you don't come with the money, I'm, I'm…I got stuck already.  About a year and a half ago I |

got stuck for $60,000 and it took me fuckin' five, six months to pay these people.

On March 16, 2012, Lupoi told the undercover that he had ordered 50 pounds of marijuana from Canada on credit, from which he was going to sell the undercover five pounds:

Undercover:   So you were saying fifty, fifty pounds?

Lupoi:          I'm getting fifty…

Undercover:   On the arm, you said?

Lupoi:          Yeah, but I got a week, but I can buy another week so I got maybe 15 days.

Undercover:   And you think you can move…

Lupoi:          I got a few people I can move…it's been for almost a year and it looks like it's…

Undercover:   This is the stuff you were saying from Canada?

Lupoi:          Yes. And this is a product with a high recommended [sic] here in this area. Like the New York area, Long Island.

Undercover:   Yeah

Lupoi:          So if we start showing it…

Undercover:   That's good.

Lupoi:          But I'm saying, this is the price we gotta get rid of it. 40-41…no less than 41.  We gotta make money.

Lupoi's familial and conspiratorial relationship with his Canadian suppliers provides him with a potential safe-haven to which he could flee without having to board an international flight.

Lupoi also has extensive ties to Italy and has lived in Calabria.  As described above, Lupoi called upon his criminal contacts in Italy during the course of this investigation.  He distributed heroin in Italy and worked with coconspirators in Italy on the Guyana-to-Italy cocaine deal.  During the investigation he also travelled to Italy frequently and he and his wife both have family there.  As described in more

detail below, Lupoi's connections in Italy – including his father-in-law and cousin – are tied to the powerful 'Ndrangheta organized crime group in the Calabria region.  If Lupoi were to be released, he may flee the charges in the United States and call upon his extensive familial and criminal network in Italy to evade prosecution in the United States.

(b)    <u>Lupoi's Ties to Poland</u>

Throughout the investigation, in the course of consensually recorded meetings and phone calls, Lupoi has discussed his ongoing relationship with a Polish citizen who previously lived in Brooklyn.  Lupoi previously explained to the undercover agent that the woman could no longer stay in the United States and had to return to Poland.  Lupoi told the undercover agent that he met with the woman on his most recent trip to Italy in January 2014 and he explained that she still resides in Poland.  Lupoi has told the undercover agent that he has considered moving to Poland to be with the woman, and Poland is therefore another potential safe-haven if Lupoi were to flee.

(c)    <u>Lupoi's Ability to Cross the U.S.-Canada Border Illegally</u>

In addition to Lupoi's connections in Canada, Italy and Poland, he also has the means to cross the U.S.-Canada border illegally, and without passing through a border checkpoint.  Lupoi described how he has a connection through whom Lupoi had previously arranged to have individuals smuggled into the United States from Canada.  On June 5, 2012, Lupoi explained to the undercover agent:

| | |
|---|---|
| Lupoi: | You could get this guy in.  I have a way of bringing a guy.  A person? |
| Undercover: | Yeah |
| Lupoi: | Yeah, without…because he can't be in this country? |
| Undercover: | Right. |
| Lupoi: | Just no problem. Just let him fly to…He's gotta be in Toronto or Montreal.  They're gonna come from the Indian reserve.  I already brought like…I charge, I charge.  The Indian guy that brings them across wants $3,000.  But the people that wanted to come here, between my family there and me, we brought it up to 20 [$20,000]. |
| Undercover: | Nice. |

13

| Lupoi: | To bring up a person. And we did make a few dollars. But completely not friends.  Some friends not even the $3,000 I took. |
|---|---|
| Undercover: | If you could help me out with this one. With this one guy if he comes, I'll take care of you. |
| Lupoi: | No problem. I will bring the guy with no money.  The only thing is he or us gotta take care of the Indian guy who brings him. |
| Undercover: | Yeah yeah yeah no problem |
| Lupoi: | And it's the same guy with the weed? |
| Lupoi: | No, no, no it's totally different people. |

Lupoi's connections in Canada and his ability to get across the border undetected makes him a significant flight risk in light of the lengthy sentence he faces if convicted of the crimes charged in the superseding indictment.

> (d)     Lupoi's Associates in Organized Crime May Seek Retribution for the Introduction of the Undercover Agent

Finally, and alternatively, Lupoi's criminal associates and coconspirators in the United States, Italy and Canada may blame Lupoi for introducing the undercover agent into their criminal schemes.  As noted above, in addition to the six other individuals arrested in the United States, Italian authorities arrested 17 additional coconspirators and associates of Lupoi related to the schemes charged in the U.S. superseding indictment.  Lupoi is an associate of the Gambino crime family and has familial links to the violent 'Ndrangheta criminal organization in the Calabria region of Italy.  Those groups may blame Lupoi and seek revenge.  If they do, Lupoi may flee to avoid these violent and retributive groups.

> 3.     The Danger Posed by Lupoi's Release is Serious

> (a)     Lupoi Has Weapons and Access to Weapons

First, Lupoi has told the undercover agent on more than one occasion, and a recently as January, that he has a weapon.

Lupoi has also shown a willingness to facilitate violent crime on behalf of the organizations with which he is associated and his criminal coconspirators.  He

recently conspired with Valente to sell the undercover agent a 9mm pistol and silencer.  On January 23, 2014, Lupoi and the undercover had the following exchange:

| | |
|---|---|
| Undercover: | When we were together one time he [Valente] was talking about, um, having, uh, you know the thing that goes on the end of a barrel? You know what I'm talking about. |
| Lupoi: | Ok, yeah.  You want one? |
| Undercover: | Would he be willing to sell it? |
| Lupoi: | Yeah, yeah, you want one? |
| Undercover: | I'd need the whole thing. Yeah, yeah. |
| Lupoi: | That we can do.  Can you swing by tomorrow? Or how you… |
| Undercover: | Definitely, definitely.  If you can find out how much, I'll even buy it tomorrow.  I need it. |
| Lupoi: | Ok. |
| Undercover: | Find out how much, I'll even buy it tomorrow. |
| Lupoi: | Check the email. Did you check the email? |
| *        *        * | |
| Undercover: | I could meet up…if you can find out I'll meet up with you tomorrow and we'll check that and we'll go and…I really need one of those.  I got something going on. |
| Lupoi: | Ok, no problem. |

Approximately a week later, on January 31, 2014, Valente sold the undercover a 9mm pistol and silencer without a serial number.  See Ex. A (photograph of pistol and silencer).  Lupoi also participated in the sale of a sawed-off shotgun to the undercover on February 4, 2014.  See Ex. B (photograph of sawed-off shotgun).   Lupoi's assistance in the transfer of a 9mm firearm, a silencer and a shotgun shows that he is willing to aid and abet serious crimes, including drug and firearms offenses, in furtherance of his relationships with criminal coconspirators, and that he poses a serious danger to the community.

15

(c)     Lupoi's Involvement in a Plan to Purchase Weapons to
Ship to Italy

In fact, in recent months, Lupoi, together with Valente, also began to make arrangements with the undercover agent to purchase hundreds of weapons, including 9mm pistols and scorpion submachine guns, which he and Valente planned to ship to Italy.

(d)     Lupoi's Ties to Organized Crime

Lupoi's involvement in the transfer of weapons and his interest in the purchase of hundreds of weapons to ship to Italy are especially pertinent in light of his association with the Gambino crime family in Brooklyn, and the 'Ndrangheta organized crime group in Calabria, Italy and Canada.

Organized crime defendants pose a particular threat to the community due to the continuing nature of the charged enterprise and its violent criminal activities.  Because organized crime defendants are often career criminals who belong to an illegal enterprise, they pose a distinct threat to commit additional crimes if released on bail.  See United States v. Salerno, 631 F. Supp. 1375 (S.D.N.Y. 1986) (finding that the illegal businesses of organized crime require constant attention and protection, and recognizing a strong incentive on the part of its leadership to continue business as usual).

Congress noted that defendants pose a danger to the community not only when they commit acts of violence, but also when it is likely that they will commit even non-violent crimes that are detrimental to the community.  See S. Rep. No. 225 98th Cong., 1st Sess. at 6-7, as reprinted in 1984 U.S. Code Cong. & Admin. News 3182 ("Senate Report"), 3195 ("[L]anguage referring to safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community . . . . The Committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence.").  In Salerno, the court approvingly quoted the Second Circuit's decision in United States v. Colombo, 777 F.2d 96 (2d Cir. 1985), which had held:

In light of Congress' direction that "[w]here there is a strong probability that a person will commit additional crimes if released, the need to protect the community becomes sufficiently compelling that detention is, on balance, appropriate," . . . we hold that the decision to release Colombo based upon conditions which we consider to be wholly inadequate was clearly erroneous.

16

631 F. Supp. at 1371 (quoting <u>Colombo</u>, 777 F.2d at 99 (quoting Senate Report at 3189) (citation omitted)).

(e)     <u>Conclusion</u>

Lupoi's possession of weapons, his willingness to assist others in procuring weapons, including his willingness to assist in the purchase of hundreds of pistols and machine guns, together with his association with violent international crime organization demonstrates the threat Lupoi poses to the community.  This factor strongly favors detention.

4.     <u>Evidence of Lupoi's Guilt</u>

As indicated above, the evidence of Lupoi's guilt is exceedingly strong. Lupoi is captured on hundreds of consensually recorded phone calls and meetings discussing and participating in all of the crimes charged in the superseding indictment.  The government intends to provide Lupoi's guilt at trial through the testimony of multiple witnesses, including the undercover agent, consensual recordings, and physical and documentary evidence.

5.     <u>Conclusion</u>

Lupoi cannot overcome the presumption of detention under 18 U.S.C. § 3142(e)(3)(A).  Lupoi's connections to Canada, Poland and Italy, together with his ability to cross the U.S.-Canada border undetected make him a significant flight risk in light of the penalties he faces if convicted of the crimes charged in the superseding indictment.  <u>See</u> <u>United States v. Dodge</u>, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (possibility of a "severe sentence" heightens the risk of flight).  The potential for retribution from his criminal associates increases that risk.  He is also a danger to the community, as shown by his possession of a firearm, his willingness to assist in the acquisition of firearms for his criminal associates, and his ties to organized crime. For these reasons, Lupoi should be detained.

B.     <u>Raffaele Valente</u>

Raffaele Valente poses a substantial flight risk because of his extensive ties to Italy.  In addition, Valente poses a danger to the community because of his ties to organized crime, his possession and transfer of a 9mm pistol and silencer and a sawed-off shotgun to the undercover agent and his threats of violence in furtherance of the conspiracy to ship cocaine from Guyana to Italy.

1.     <u>The Nature and Circumstances of the Crimes Charged</u>

As set forth above, Valente is charged in Counts Thirteen through Fifteen, all related to the transfer on January 31, 2014 of a 9mm pistol and a silencer

with no serial number.  See Ex. A (photograph of 9mm and silencer).  After the grand jury returned the superseding indictment (S-1), Valente sold the undercover agent a second weapon – a sawed-off shotgun.  See Ex. B (photograph of sawed-off shotgun). For these crimes, Valente faces a maximum sentence of ten years imprisonment. Valente is also charged in the Italian indictment with the conspiracy to import cocaine from Guyana to Italy.

### 2.    The History and Characteristics of the Defendant

Second, like Lupoi, Valente has extensive ties to Italy. He is an Italian citizen and a Legal Permanent Resident of the United States.  Valente is a member of 'Ndrangheta and has maintained his close ties to Italian organized crime while in Brooklyn.  He has travelled to Italy frequently and has stated to the undercover that he intends to travel to Italy on February 14, 2014 in furtherance of a plan, with Lupoi, to sell $1,000,000 in counterfeit U.S. currency to the undercover agent.

In the course of the investigation, Valente provided the undercover agent with a sample counterfeit U.S. $100 bill.  Valente's access to counterfeit currency makes any bond amount meaningless, as he could flee with counterfeit currency or attempt to pay off suretors with the counterfeit funds or proceeds from the sale of those counterfeit funds.

Valente's extensive ties to Italy, his access to large amounts of counterfeit currency and his willingness to engage in criminal fraud in furtherance of his schemes demonstrate that he is a significant flight risk.  This factor strongly favors detention.

### 3.    The Danger Posted by Valente's Release is Serious

Valente, an associate of the 'Ndrangheta, is also charged in Italy with the crime of mafia association.  Valente has been recorded on Italian court-authorized wiretaps bragging about the armed and violent group he has assembled in New York. Valente explained to Italian defendant Andrea Memmolo, "…but do you know how we are ready?  Has he told you about the architecture [i.e., set-up] that we have, or not? Have they ever told you?", "We are set up 'badly' [meaning well-organized] . . . it's like Fort Knox!", "it's like the central gas . . . there are things over the windows . . . like if you pull the cords, the shots come!", "yesterday we were armed to the teeth".

Valente also explained his allegiance to Saint Michael the Archangel, the patron saint of the 'Ndrangheta, whose followers are required to wear a ring as a symbol of their allegiance.  He explained, "no, ok… now we have bought the Saint Michaels, all the statues of Saint Michael at Christmas, we all gave them as presents to each other, they are lovely, do you know how lovely the statues of Saint Michael

18

are? With the devil under his feet … so nice … so I only have to bring it to you … the ring, did you get it?"

In the course of consensually recorded meetings in the U.S., Valente has bragged repeatedly about his collection of firearms, and is charged with the transfer of two weapons – a 9mm pistol with a silencer and a sawed-off shotgun – to the undercover agent.  He has also participated, along with Lupoi, in discussions with the undercover agent about purchasing hundreds of pistols and machine guns for shipment to Italy.

During Valente's participation with Lupoi in the conspiracy to ship cocaine from Guyana to Italy Valente has, in the course of recorded meetings and phone calls, repeatedly threatened violence against Alexander Chan and Garcia for their failure to complete the deal.

Valente is armed, dangerous, and proud of his reputation for being both.  He has demonstrated his willingness to supply others with firearms for criminal endeavors and he has expressed his interest in working to arm his confederates in Italy with hundreds of pistols and machineguns.  Valente is a serious danger to the community and should be detained.

4.     Evidence of Valente's Guilt

The evidence of Valente's guilt is exceedingly strong.  Valente is captured in consensually recorded meetings discussing and participating the crimes charged in the U.S. superseding indictment and the conspiracy to ship cocaine charged in the Italian indictment.  He is also captured on Italian wiretap recordings discussing his criminal activity in the U.S. and Italy.  The government intends to provide Valente's guilt at trial through the testimony of multiple witnesses, including the undercover agent, consensual recordings, and physical and documentary evidence, including the two weapons sold to the undercover agent.  See Exs. B, C.

5.     Conclusion

Valente is armed, violent and well-connected in the United States and Italy.  He poses a significant flight risk and a danger to the community if he is released.  Accordingly, a permanent order of detention should be entered.

C.     Alexander Chan

Alexander Chan poses a substantial flight risk and a danger to the community and should be detained.

1.     The Nature and Circumstances of the Crimes Charged

Chan is charged with distribution of more than one kilogram of heroin in the U.S. and with a conspiracy related to the shipment of hundreds of kilograms of cocaine from Guyana to Italy. For these crimes, Chan faces a maximum sentence of life imprisonment. For counts Nine and Ten, he faces a mandatory minimum of 10 years' imprisonment.

As with Lupoi, under the Bail Reform Act, it "shall be presumed that no condition or combination of conditions will reasonably assure the appearance of [Chan] as required and the safety of the community" because Chan faces a maximum term of life imprisonment if convicted of Counts Seven, Eight, Nine or Ten. See 18 U.S.C. § 3142(e)(3)(A). All four counts provide for a maximum term of life imprisonment and a minimum term of ten years' imprisonment, and, accordingly, the rebuttable presumption of detention under 18 U.S.C. § 3142(e)(3)(A) applies. For the reasons below, Chan cannot overcome the presumption and he should be detained.

2.    The History and Characteristics of the Defendant

Chan was arrested and charged with a conspiracy to distribute heroin on September 24, 1997. See United States v. Hing, et al., 97 CR 01053 (S.D.N.Y.) (LMM). Chan was convicted following a jury trial and sentenced to 60 months' imprisonment and four years' supervised release. On October 27, 2008, Chan, through his lawyer, requested that his period of supervised release be terminated early. Judge McKenna granted Chan's request as of July 31, 2009, approximately 11 months early.

As set forth in Chan's lawyer's letter to Judge McKenna, Chan has ties to Taiwan and China. Chan's lawyer explained that

> In April of 2007 [Chan] was permitted to travel to Taiwan to remarry and again in January of 2008 he was permitted to return to Taiwan to visit the American institute of Taiwan for the purpose of legally validating said marriage, and to facilitate the return of his bride to the United States.

See Ex. C. He also indicated that Chan had

> established a construction company (Dream Homes Inc.) which has successfully evolved into a building and rehabilitation firm in both the industrial and home fields. . . Mr. Chan has been solicited by various individuals and organizations to participate in China in the rehabilitation of property which has been devastated by earthquakes earlier this year in the Sichuan province of China. . . . I respectfully submit that Mr. Chan in his release has rehabilitated himself to a degree which is rarely seen in our society and I respectfully ask this Court to extend the relief sought.

20

See id.  In light of the lengthy sentence Chan faces, his ties to Taiwan and to China make him a significant flight risk.

   3.  The Danger Posted by Chan's Release is Serious

    Chan's previous federal conviction and sentence did not deter him from the international drug trade following his release and his purported rehabilitation was short-lived.  Just over three years after Judge McKenna granted Chan's unusual request to terminate his period of supervised release, Chan was conspiring with Lupoi and others to transport cocaine supplied by Mexican cartels to Italy.  Indeed, Chan's present links to the Mexican drug cartels, through his coconspirators Garcia and others, suggest that Chan became more involved in the international narcotics trade following his release from prison.

    Chan's continued involvement in the narcotics trade is particularly egregious in light of Judge McKenna's decision to grant Chan's request to terminate his supervised release a year early.  Chan's recidivism, particularly in light of Judge McKenna's unusual leniency, demonstrates that Chan is likely to continue to engage in narcotics trafficking if released.

   4.  Evidence of Chan's Guilt

    The evidence of Chan's guilt is exceedingly strong.  Chan is captured in consensually recorded meetings and phone calls discussing and participating in the heroin transaction and the conspiracy to ship cocaine from Guyana to Italy.  The government intends to provide Chan's guilt at trial through the testimony of multiple witnesses, including the undercover agent, consensual recordings, and physical and documentary evidence, including the heroin he sold to the undercover agent.

   5.  Conclusion

    Chan cannot overcome the presumption of detention under 18 U.S.C. § 3142(e)(3)(A).  The lengthy sentence he faces for the crimes charged in the superseding indictment and his apparent connections to Mexican drug cartels makes him a flight risk.  See United States v Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (possibility of a "severe sentence" heightens the risk of flight).  Moreover, his prior conviction and recidivism demonstrates that it is likely Chan will continue to engage in narcotics trafficking if released.  Accordingly, Chan should be detained.

   D.  Jose Alfredo Garcia

    Garcia poses a substantial flight risk and a danger to the community and should be detained.

1.      The Nature and Circumstances of the Crimes Charged

Garcia is charged with distribution of more than one kilogram of heroin in the U.S. and with a conspiracy related to the shipment of hundreds of kilograms of cocaine from Guyana to Italy.  For these crimes, Garcia faces a maximum sentence of life imprisonment.  For counts Nine and Ten, he faces a mandatory minimum of 10 years' imprisonment.

As with Lupoi and Chan, under the Bail Reform Act, it "shall be presumed that no condition or combination of conditions will reasonably assure the appearance of [Garcia] as required and the safety of the community" because Garcia faces a maximum term of life imprisonment if convicted of Counts Seven, Eight, Nine or Ten.  See 18 U.S.C. § 3142(e)(3)(A).  All four counts provide for a maximum term of life imprisonment and a minimum term of ten years' imprisonment, and, accordingly, the rebuttable presumption of detention under 18 U.S.C. § 3142(e)(3)(A) applies.  Garcia cannot overcome this presumption.

2.      The History and Characteristics of the Defendant

Garcia is tied to the Mexican drug cartels and, as Lupoi explained to the undercover during a consensually recorded meeting, Garcia was linked to the suppliers of the cocaine the coconspirators sought to transport from Guyana to Italy.  His ties to these organizations make him a significant flight risk if he is released.  In addition, Garcia has a criminal history going back over a decade, including convictions for heroin and cocaine possession and distribution and weapons charges.  In 2001, for example, Garcia was sentenced to 48 months' imprisonment in a case that involved multiple charges, including conspiracy to distribute over five kilograms of cocaine and using and carrying a weapon in relation to a drug trafficking crime.

3.      The Danger Posed by Garcia's Release is Serious

Garcia has indicated his willingness to commit violent crimes in furtherance of the cocaine conspiracy, and he poses a serious danger to the community if released.  During a consensually recorded meeting at a Dunkin Donuts in Manhattan on December 1, 2012, Lupoi, Chan and the undercover discussed the request for a $12,000 payment to do a "test run."  Garcia, in trying to assuage Lupoi's concerns that the request for $12,000 was a scam, told Lupoi "trust me, this dude doesn't need to, to steal, okay, twelve thousand dollars.  No I could go directly to his house, say listen, what happened?  And I could take him in.  We could take him and make him disappear if we had to, but the point is, don't stress about Monday.  Monday morning, I get an answer back.  You'll get an answer and we keep moving forward . . . ."

4. <u>Evidence of Garcia's Guilt</u>

The evidence of Garcia's guilt is exceedingly strong.  Garcia is captured in consensually recorded meetings discussing and participating in the heroin transaction and the conspiracy to ship cocaine from Guyana to Italy.  The government intends to provide Garcia's guilt at trial through the testimony of multiple witnesses, including the undercover agent, consensual recordings, and physical and documentary evidence, including the heroin he sold to the undercover agent.

5. <u>Conclusion</u>

Garcia cannot overcome the presumption of detention under 18 U.S.C. § 3142(e)(3)(A).  The lengthy sentence he faces for the crimes charged in the superseding indictment and his apparent connections to Mexican drug cartels makes him a flight risk.  <u>See</u> <u>Dodge</u>, 846 F. Supp. at 184-85 (possibility of a "severe sentence" heightens the risk of flight).  Moreover, his prior conviction and recidivism demonstrates that it is likely Garcia will continue to engage in narcotics trafficking if released.  Accordingly, Garcia should be detained.

IV.   The Remaining Defendants Should Be Required to Present Substantial Bail Packages

The remaining three defendants, Charles Centaro, Christos Fasarakis and Dominic Ali, should all be required to post substantial bail packages if they are to be released on bond.

- Charles Centaro is an associate of the Bonanno crime family and a one-time driver for former Bonanno family administration member Vincent "Vinny TV" Badalamenti.  Centaro also has access to significant resources from his family's businesses and from his uncharged and unidentified money laundering coconspirators.  Throughout the investigation, Centaro has repeatedly bragged about the funds to which his uncharged coconspirators have access, including over $200 million dollars in a Swiss bank account and millions of dollars available for immediate transfer into U.S. accounts.  These resources make Centaro a flight risk, and he should be required to post a bond signed by financially responsible suretors and secured by property.

- Christos Fasarakis is a bank manager at Alma Bank in Brooklyn.  At the time of his arrest, agents seized $600,000 in cashier's checks from Fasarakis, which were to be used in a money laundering deal with the undercover agent.  Like Centaro, Fasarakis has significant resources, which he drew upon in the course of the money laundering scheme.  He also has familial ties to Greece.  Fasarakis is a flight risk, and he should be required to post a bond signed by financially responsible suretors and secured by property.

- Dominic Ali, like his coconspirator Fasarakis, has significant resources, which he drew upon in the course of the money laundering scheme.  Ali is a flight risk, and he should be required to post a bond signed by financially responsible suretors and secured by property.

V.     <u>Conclusion</u>

   For the foregoing reasons, the government respectfully submits that Lupoi, Valente, Chan and Garcia pose both a danger to the community and a risk of flight that cannot be mitigated by any condition or combination of conditions.  They should therefore be detained.  Centaro, Fasarakis and Ali should be required to present a substantial bail package to mitigate the risk of these defendants' flight from prosecution

Dated:  Brooklyn, New York
    February 11, 2014

        Respectfully submitted,

        LORETTA E. LYNCH
        United States Attorney
        Eastern District of New York
        271 Cadman Plaza East
        Brooklyn, New York 11201

     By: <u>/s/                                    </u>
        Cristina Posa
        Kevin Trowel
        Kristin Mace
        Assistant United States Attorneys
        (718) 254-6351

EXHIBIT A



# EXHIBIT B



# EXHIBIT C

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/14/08

LAW OFFICE

# JACOB R. EVSEROFF, P.C.

9201 4TH AVENUE    •    BROOKLYN, NEW YORK 11209

(718) 759-0903                                    FAX: (718) 921-4526

**RECEIVED
IN CHAMBERS**

October 27, 2008

## MEMO ENDORSED

Honorable Lawrence M. McKenna
United States District Court
Southern District of NY
500 Pearl Street
New York, New York 10007

■ -5 ■

**LAWRENCE M. McKENNA
USDJ    SDNY**

Re: Alexander Chan

*(97 CR. 1053)*

Dear Judge McKenna:

I respectfully submit this letter in the nature of an application for an early termination of a remaining period of unsupervised release for Mr. Alexander Chan.

Mr. Chan was convicted in 2002 and sentenced to 5 years incarceration and a probationary period of 4 years for drug violations. In June 2006 he was released from custody to probation. In April of 2008 he was transferred to a Phase II probation (unsupervised). The entire probationary period will expire in June of 2010.

During the period of probation since June 2006 there have been no violations. Mr. Chan was divorced by his wife during his incarceration. The two children of that marriage have been supported financially and socially by their father ever since his release. In April of 2006 Mr. Chan established a construction company (Dream Homes Inc.) which has successfully evolved into a building and rehabilitation firm in both the industrial and home fields.

In April of 2007 he was permitted to travel to Taiwan to remarry and again in January of 2008 he was permitted to return to Taiwan to visit the American Institute of Taiwan for the purpose of legally validating said marriage, and to facilitate the return of his bride to the United States. Both of these trips were negotiated without incident.

Mr. Chan has been solicited by various individuals and organizations to participate in China in the rehabilitation of property which has been devastated by earthquakes earlier this year in the Sichuan providence of China. I have enclosed herewith documentation relative to the nature of these solicitations for Mr. Chan.

The relief which Mr. Chan now seeks in the nature of a shortening and termination of the remaining period of unsupervised release is with a view to facilitate extensive travel which would be necessary to accomplish the ends of such a foreign venture.

I respectfully submit that Mr. Chan in his release has rehabilitated himself to a degree which is rarely seen in our society and I respectfully ask this Court to extend the relief sought.

Very Truly Yours,

*[signature]*
Jacob Evseroff

*This application should be made in the first instance to Mr. Chon's Probation officer (who, the Court understands, is Mr. Eric Harmon, E.D.N.Y., Central Islip). So ordered.*

*[signature]*
USDJ 11/14/08